Move to the third case, Harris-Billups v. Anderson, which is 22-10-033. We've got Mr. Mohamed here for the appellant, Mr. Britt here for the appellee. Mr. Mohamed, whenever you're ready. Good morning. May it please the Court. We relied heavily on the Hunter case. After the briefs were submitted, this Court entered an opinion. Robinson v. Sahls, the case number is 21-11280. I have the F-4th citation as well, 46 F-4th 1332. The Robinson v. Sahls case resolves the issue regarding the clearly established law in absolute terms, relying on specifically the Hunter case. Between the Hunter case and the Robinson case, really in both of them, every argument that is also present in both of those cases. In the Robinson case, that case involved specifically officers going to an apartment to execute an arrest warrant. When they arrive, they go into the apartment. The person that they are trying to apprehend has a firearm, points the firearm at the officers. There is evidence that that firearm is discharged. There are multiple volleys of shots. There is a point in time where that individual is struck by the officers, a couple of volleys of shots, falls down to the ground. There is a flashbang that the officers discharge to see if the individual would respond. That is where the factual dispute comes in, where the officers make one claim, but audio footage from a neighbor outside basically indicates that after the flashbang, there was an additional volley of shots. In both of these cases, the Hunter case obviously deals with the individual being in a car, multiple volleys of shots, everything is transpired within seconds. The gun is pointed at the officers, all of the different issues that we have in our case. Can I ask you one question? Maybe it's a compound question, but so about both cases, both Hunter and Robinson. So Hunter obviously is decided after the incident in this case, but it, if I'm remembering correctly, but it references an incident that occurred before the incident in this case and says that the law was clearly established as to that. So maybe you can sort of like reach back behind Hunter for clearly established purposes. So my first question is, is Robinson the same way? Robinson actually answers your question. This quote is in Robinson. Although we decided Hunter in 2019, we concluded in that case that by at least 2013, it was readily apparent that using deadly force on a suspect who had been, but was no longer a threat was unconstitutionally excessive. Perfect. Okay. So that's a beautiful answer to question one. Very helpful. Question two, is there in either Hunter or Robinson, the sort of lurch or twitch that we're dealing with here? Because I don't think there was in Hunter. And it seems to me like that's what makes this case different. And I've watched the horrific video, but that's what it seems like might make this case different. I wouldn't, I wouldn't characterize them as lurch or twitch. I think this case really… You mean this case or those cases? I guess, do you, do you, maybe I should ask you this. Like, I'm sure you've had to watch the video a thousand times. Do you deny that on the video there is a lurch or a twitch or however you would describe what I'm describing that way? There is movement. And then did that exist in either Anderson or Robinson? Hunter, Hunter, Hunter, Hunter or Robinson. Sorry. Well, in Robinson, no, for sure. In Hunter, there is the issue of the firearm being pointed. And so, to some extent, that would be… But there's not, because we, in Hunter, we didn't have a video. And so, we accepted, for purposes of summary judgment, the evidence and the light most favorable to the, to the, to the victim in that case. And in that case, he testified, because he was still alive, I believe, which is also very different, that I had dropped the firearm and it was outside the door and I had given up at that point. And so, I think the answer to Judge Newsom's question is in Hunter, at least in the light most favorable to the plaintiff, which the facts were taken, there was no additional lurch or movement after the first volley of shots, right? That's a fair characterization. I believe that the arguments that are advanced by the officer in our case really comes down to the placement of the two firearms. Because this lurch or twitch argument is only relevant to the extent that the argument can be made that there is a reasonable belief that either he has a firearm or he's grabbing a firearm or something to do with that. So, let me ask that first part, because that actually is a question I had. Is it reasonable for the officer to think that there could be another firearm at play that she does not see? In other words, as I understand the facts here, one firearm was pointed at her, the other officers, and was waved about. He goes into the car. He drops that firearm. And then there's another firearm that ends up being the one that shot at Officer Mason. And those two are the ones that are on the ground. Is it unreasonable to think that there could be another weapon at that point where the officers have already dealt with one? And in fact, as I understand—sorry, this is a long question. As I understand it, Officer Mason, he even said when the first weapon was dropped, okay, he actually takes out his taser instead and says, weapon dropped. And then once the second firearm comes, he then takes back out his service weapon. Right. So, is it not—I guess what I'm saying is, given those facts, is it not reasonable for an officer in—is it Officer Anderson's position to think that there could be another firearm? Well, I'll take your question in sections, actually. The point in time where Officer Mason is doing what you described is really before the volleys of shots. Yes. We concede that there was reasonable conduct on those two volleys. So that would remove— I know, but we can't divorce what the officer saw and heard in the—I know the minute and a half of the video that we're talking about and then the five or so minutes before that from what happened there. I mean, all that's in Officer Anderson's head at that moment. But two points. Officer Anderson does not describe a missing firearm as her justification for the final shot. That was an argument, as I indicated in my brief, that the lawyers advance. The district court also stated it, but Officer Anderson states clearly, I saw a firearm and I thought he reached to it. Do we look—does the test have us look at her subjective understanding, or does it have it look at objectively what an officer in her position would have believed? I believe it's objective, and I would say to the court that the distance, as you can see at timestamp 138, between the two firearms is about equal, estimating, obviously, is the distance between the right side of one of these chairs and the left side. So the real question is, can I look at the right side of this chair and not see the left side? And so when we're talking about what a jury can reasonably conclude, they have to believe that Officer Anderson has her firearm pointed. She sees a firearm here, and with all of her peripheral vision, can't see one that is right next to it. Let me be clear, though. The question I'm asking isn't about that. I think your argument has a lot of appeal for the two firearms that are on the ground. I'm thinking—my question is, is it possible for—could a reasonable officer have believed in that circumstance that there was a third or another firearm that he could have had access to? No, that isn't reasonable. Number one, you see his hands, and this is all viewing evidence in a light most favorable to the law. Lurch is his hand. So as I understand, he takes—the hands are up here, and what he's lurching—it looks like he's sort of coming up very quickly, and the hands are going down, and that's when the last shot happens. That's how—that's what I saw. Am I—am I seeing that incorrectly? I would agree with that. Okay. There are hands where you can see that there is no firearm. Right. And there is a movement due to pain where he comes this way, and both firearms are visible a short distance away where there is—the argument to a reasonable jury would be you cannot possibly see his body laying there and with peripheral vision not be able to see the firearm. She says she sees one firearm. The other firearm is such a close distance away, it isn't even possible to see him and one firearm and not the other. But I think—and again, not to put words in Judge Luch's mouth—but I think his question is, is it possible that there is a third firearm here or there? There are two on the ground. I mean, I guess I'm not asking is it possible that there was. Is it possible that a reasonable officer could have concluded that there was one here, here, waistband, whatever? Before I answer that, I believe it would be more relevant that she does—she offers her reason for the shot, and she does not say that. She says he's reaching—I saw a firearm and he was reaching for it, and he lunged in the direction of Officer Mason. Is it reasonable for an officer to have tunnel vision at that point? In other words, we're only seeing—we only see the perspective of—I guess I think the camera's about here, right? Is that— Right. So is it reasonable that an officer would have the same tunnel vision in that circumstance? In other words, in a normal circumstance, my peripheral vision's really good. I can see Judge Newsom giving me a face when he's giving me a face. I can see, you know, what's going on to my right if a colleague is doing something. But in that circumstance, I may not be—it would seem to me that one would be focused only there and may not be able to see that which is normal to the right or to the left. But again, and this—there are perspectives. And that argument could be advanced to the jury. But the question is, as a matter of law, is the plaintiff's position unreasonable that the officer—that a jury can believe that an officer looking at a body, saying I see the firearm, she concludes that she sees it, then says my reason for this shot is that he reached for it, but you can see he does not. The video clearly shows he does not reach for it. The video clearly shows it was not within his reach. So she says I shot because he reached for it and because he lunged toward Officer Mason, when clearly that was the justification for the second volley. It was not the justification for the final shot. So now what we're talking about is not whether or not a jury could believe that scenario, but whether or not, as a matter of law, our ability as the plaintiffs to say, this officer looked, she sees him, she reloads, she was positioned in a way for safety, for cover, but now she comes around, she aims— Careful. I think we now can't hear you on the— I'm sorry. She comes around and says that she sees a firearm, says that he reaches for it when he does not, says that he's lunging for Officer Mason when he's not, and there is no way— And again, can this argument be made to a jury as a matter of law? There's no way she can't see that second firearm right next to it because of basic peripheral vision, and she shoots not because he is a threat, but because she could see that he still was able to make pronounced movements. In other words, she's almost using the firearm as handcuffs where he's shot, he's down, but once she sees that he's able to still move, she wants to stop the ability to move, and she shoots for that reason. Those arguments that I gave as a matter of law, is there a reason they can't go to a jury? Certainly not. Okay. So let me just sort of put this on your radar screen so that you'll be aware of it on rebuttal. I think we've gone on in your opening long enough, but there is this piece of this case that just seems like to the extent that there is any circumstance in which the excessive force analysis, the relatively deferential excessive force analysis that the Supreme Court, the fairly established law standard that governs qualified immunity, this is the case that sort of like seems to just beg for that analysis. The video, I mean, I think it's easy enough for us in the quiet of the courtroom to say, you know, he was not reaching for the gun, but all of this happened in a fraction of a fraction of a fraction of a second. And so I just want you to be prepared and rebuttal, at least to satisfy me that this is not the kind of case that is sort of core excessive force, clearly established law, Heartland. Thank you so much. All right, Mr. Britt, let's hear from you. Thank you. Your Honors, may it please the Court. The question before this panel is simple, and that's whether Harris-Billups met her burden in piercing Officer Anderson's entitlement to qualified immunity. The district court correctly answered that question both on summary judgment and again when Harris-Billups attempted to move to amend the summary judgment order when it said no. Under the black letter law, it's clear. Now, I would like to start with the clearly established prong given the fact that some new case law was raised. I will note opposing counsel did not submit a motion to supplement the record or provide a supplemental brief with new case law. I'm not prepared to discuss the specifics of the Robinson case today. However, I can say that the representations on the Robinson case, as with the Hunter case, show a continued misunderstanding of the clearly established prong. The Supreme Court continues to admonish circuit courts for misapplying that prong. They did so in White v. Pauley. They did so again in an opinion written by Justice Thomas. Just so we're clear, what's the misapplication that you think he's engaged in? So the misapplication is his sole reliance for clearly established law is the Hunter case. But the Hunter case is clearly distinguished for multiple reasons, as noted by this panel, as noted by the district court, and as noted in our briefs. But the problem is, though, we've been clear as day, even after the Supreme Court cases you're referring to, that there are three bases to find clearly established law in our circuit. One is the material similarity of the case. That's what you're referring to. And I tend to agree with you that there are some material differences between the Hunter case and this one. The second is broadly established principles in a case that would put every reasonable officer on notice that what they did was unconstitutional. And the third is what I'll call sort of the so obvious it's unconstitutional, we don't even need to tell you in advance. And he argues all three, but really the focus is on that second bucket. And Hunter has some language in there that seems to be broadly established, and that we imply was broadly established well before Hunter was decided. And if you can focus on that, that would be very helpful to me. Yes, Your Honor. But first, if I may, you know, I would like to challenge a little bit that second way of establishing. I would say that the Supreme Court focuses more on whether it meets that first test, which is the materially similar. I know what the Supreme Court has said, but there is, at this point, we're so far down the path, and we have cases that have come out after those Supreme Court cases you're clear that that second avenue is available. So here, so I can just jumpstart us a little bit. Hunter says, as a matter of broad principle, quote, an officer may not use deadly force on a suspect who is unarmed and poses no immediate threat to law enforcement officers at the scene. And then it additionally says, quote, using deadly force without warning on an unarmed, non-resisting suspect who poses no danger is excessive. And then finally, using deadly force without warning on an unarmed, retreating suspect is excessive. Those are all direct quotes from Hunter. How does a reasonable officer not be able to read that and say, this is exactly what is excessive? I understand that. Everybody would understand it. If you use deadly force to shoot somebody without warning on an unarmed, non-resisting suspect who poses no danger to me, that is excessive. That would seem to be clearly established, would it not? It would if the facts of the case could be applied to that standard. So that's the issue. It isn't that your opposing counsel is applying the wrong law here. It's that you think the facts of this case don't fit that broad principle. Is that what I understand you to be arguing? Well, correct. I mean, under the first test that this circuit uses. But I will note that the first test is really the only test that Harris Billups applied in her appeal. If you notice, they waived the obvious clarity exception. Instead, they really doubled down on Hunter being similar in facts, which it's not. And, you know, real quick before we get off, I understand and I agree with the panel 100% that the 11th Circuit has continued to suggest the three different ways. They did so in the Powell case, which is cited in our brief. However, you'll note if you look through, read through that decision, even though they noted the three, they really only focused on the first and the third. Can I ask you a question? I don't think I understand why you're fighting this question so desperately. I mean, tell me why I'm wrong. I guess I would have thought one response to Judge Locke's question might have been, right, that case says that poses no threat to the officer. And I guess I would have thought you would have said, sort of given the totality of the circumstances, a reasonable officer could have concluded that there was a grave threat. I just, counsel, I just have to take exception a little bit to what you said. I'm looking at page 33 of the blue brief. It says, although officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours with material identical facts, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights. That's exactly what I articulated. To me, it seems they did argue that. And I apologize, I may have misunderstood the characterization because I see that more as the first test. But I don't want to challenge that today because I want to show the court or tell the court that it doesn't matter because Hunter is completely distinguishable on the facts. And if you look at the facts in our case, it's more similar to the John Batiste case that was decided in 2010. Well, let's, do me a favor, counsel. So let, if we can agree that this is the broadly stated principle, using deadly force without warning on an unarmed non-resisting suspect who poses no danger is excessive. Can we agree that that's the broadly established principle? Yes, Your Honor. Okay. So we agree deadly force was used. There's no question about that, correct? Yes. Okay. Was there, was this done without warning? Yes. Okay. Was the suspect unarmed? The suspect had a, a, at least one gun within reach. Okay. And so let's talk about that. So tell me what facts, undisputed facts that the district court on summary judgment could find to be the case in your favor. Sure. So first it's important to note, as Judge Newsom did, the totality of the circumstances. The Harris-Billups agreed and did not dispute any of the facts leading up to the encounter, including the encounter itself. The only fact that the appellant disputed was the shot itself. And in doing so, they're begging the court to construe the facts in their favor, but they don't provide any evidence to support that other than a metaphysical type suggestion, which the Supreme Court in Anderson back in 1986 said that that's not sufficient to overcome a genuine fact. Instead, the video evidence is clear, which can overcome their blanket allegations that have no support in the record under Scott v. Harris. Was one of the firearms within reach? Yes, Your Honor. How is that the case for someone who had been shot, what, four or five times at that point? Because just because somebody has been shot, you don't know to what extent they've been shot. And as shown in the video, it's not clear whether the decedent was incapacitated at the time of that final shot. How far was the closest of the two firearms to Mr. Harris at the time that the final shot was done? The exact distance is not clear. Plaintiffs simply without any kind of support suggest that it's more than four feet. But if you look at the declaration of Officer Anderson, she said the gun was within his reach from her observation. He doesn't challenge that. He didn't depose her in this case. So that's what's in the record. Okay. So then we have the non-resisting suspect. Was Mr. Harris at the time of the final shot or sometime between the two shots non-resisting at that point? He had been leading up to the final shot. He had been non-resistant, or he had been resistant the entire time. And I think that's the key distinction between this case and Hunter. Because in Hunter, as this Court noted, there was a dispute of fact where the plaintiffs said that they got shot, recoiled back into the car, and after, only after a command to drop the gun was made, he dropped the gun out of the car. Now, that was obviously highly disputed in that case, but I think that is a very important distinction here. Because at no time during this encounter did Harris ever comply with any of the commands that included 37 or so in the 71 seconds leading up to that final shot. But just so Judge Locke can get an answer to his question. I mean, like, I think we understand your, you know, understandable desire to have us consider the totality of the incident. But at the time the last shot was fired, is he resisting anymore? Just answer. No, he wasn't in the act of physically resisting anyone. Just like the Court also noted, there was no warning before the last shot. But that's not necessary. Okay, but so I think Judge Locke has one more factor he wants to get through. And that is, who poses no danger? Did the suspect pose no danger at the moment, at the time the last shot was there? I think he did. Under objective reasonable standard, he definitely posed no danger. And let's talk about that. Tell me what evidence, undisputed evidence, there is in the record of that. The undisputed evidence in the record is the fact that after multiple commands, he didn't comply. He then shot at an officer. Whether he actually hit the officer or not is irrelevant. He shot at an officer. And then he continued to progress towards that officer. So this brings up a larger question I have, which is, to what extent do we consider what is an objectively reasonable threat to the officer at the moment of the last shot? So what do we consider? How much do we consider? And to what extent does that impact what the officer believed at that moment? I think it impacts a lot. You can't look at something in a vacuum. And this was discussed by Chief Judge Pryor in the Tillis case. That they led four cars on a high-speed chase before shots were taken and the car stopped. But then the lights were still on and it was unclear whether the car was going to move again. And there were six seconds between the last shot of the first volley and the next volley. Now, Judge Lane at the district court said, oh, well, that second round was excessive because it was not clear whether that person would actually progress towards that individual. Chief Judge Pryor said that's not enough. Is the difference there that the deadly weapon, the car in that case, was still in the possession of the suspect? No, because the facts of that case show that it was unclear in that six-second time whether the plaintiff had been incapacitated and whether the vehicle had been incapacitated. Well, I know that. But I meant he's still in possession of the deadly weapon. They just didn't know the state of it. The difference here, I think, is the deadly weapon was some distance away from where Mr. Harris was after he had been shot three or four times at that point. Only one of the guns was away. And as this Court noted, it is an objective, reasonable standard. And so it is reasonable, objectively reasonable, for an officer to believe that not only is the second gun possibly within reach, but there could be a third, fourth, and fifth gun on his body. We don't know that yet because this is a split-second situation that is vastly evolving. And so back to the original question, it's important to look at the totality of the circumstances, not just the last incident in a vacuum. And the totality of the circumstances, which plaintiff concedes all the way up to the final shot, show that he was being noncompliant, he shot an officer, he progressed towards that officer, he then went down a mere four or five seconds past. And then there was a twitch, a strong movement from his head to his body. And it's clear under case law and this circuit that Officer Anderson did not have to wait and see what would happen. So it looked to me, I too have watched this too many times. It's horrific. It's horrific. It's horrible to watch all the way around. The, as I understand it, the hands move from here to here and there looks to be some upper body movement. Explain to me what you think you see in that second or two. Well, Your Honor, what I think I see is irrelevant. Give me your, you've seen it many times. I'm interested in what you're seeing to the extent it matters to what I see and what the court is seeing. I see a very progressive movement, a strong movement from the head to the torso. And I see as if he's moving off his right side towards the officer that he shot at, towards the same officer that he was advancing toward before he fell to the ground. That's what I saw after watching the video over 100 times. And, you know, I think Judge Newsom said it best. And, you know, that leads me to one of my favorite cases that this circuit has ever published because we can't just sit here with a cold record. And the Crosby case made that clear and make an excessive inquiry. We're not to view the matters judges from the comfort and safety of our chambers fearful of nothing more threatening than the occasional paper cut. And that's what we can't do here because we've got a split second situation based on the totality of the circumstances where we don't know whether there's another weapon, whether he's still a threat. He hasn't been handcuffed yet. So it's objectively reasonable for Officer Anderson to act the way she did. And quite frankly, I'm very proud of her for doing that. Unless the court has any questions for me. Okay, very well. I'm out of my time. Thank you so much. Mr. Muhammad, you've got your full five minutes remaining. To the question that you kind of framed just before I sat down. I didn't frame it very well, but you get the gist of it, right? I mean, to the extent that this deferential excessive force standard applies and to the extent that qualified immunity takes account of officers need to make split second decisions. This case just, in some ways, I've never seen anything quite like it. I think it boils down to whether or not this court wants to put a time limit on in qualified immunity cases to say, well, if it happens in this many seconds, then there's qualified immunity. There are too many, and if it happens in a certain number of seconds, the details don't matter. That's really what Officer Anderson is inviting the court to basically say. Well, the last shot and the facts and the circumstances associated with it are clearly distinct from what happened before it, but because there's X number of seconds, then those details don't necessarily matter. Just so I'm clear, when you're talking about that those details don't matter, are we talking about the details immediately preceding the fatal shot, the sort of what I'll call the positioning of the guns, the lurch, that stuff? Right. In other words, we're not going to analyze whether or not her actions were reasonable in that moment because when you connect it to the time frame where she acted reasonably, there was a short number of seconds. Therefore, we're not going to analyze that final shot. That's really what the court is being invited to. I guess I'm thinking about it. I see that, and I think you're right that we are being urged to consider the totality of the incident. But even if we just look at this narrow slice of time, forget about what happened before, like let's say the two seconds just before the shot, lurch shot. In some ways, I think it's a lot to ask of an officer to process that quickly that if I discharge my firearm here, I'm violating the United States Constitution. The issue, again, is about what the jury is able to decide. I think what's happening, what would happen if this case were not allowed to go to the jury, is that something that, this thing that I think the court is struggling with, the court should let the jury struggle with it because there are too many facts. For every fact that the defense can name, the plaintiff has a counter that I believe is stronger than the argument of the defense. She is in a position of cover during the first and second volley. Can I ask something about the fact? What about the reach? So I know from the video you say it's about four feet or so, that's what's argued. And then there's the affidavit of the officer which states that it's within reach. It was within his reach. How is that fact contradicted? The way that I would start that analysis is that she says he actually did reach. So we're talking about what should go to the jury now. She says he actually did reach, but the video shows he didn't. So therein... I'm simply talking about, I understand that, but I'm talking about the distance right now. She testifies that the firearm was within reaching distance. My observation is that simply putting his hand up, he wouldn't have been able to get it. He would have had to do some kind of scoot or movement or get up a little. Now, it wouldn't have... So simply based... It was immediately out of reach. The contradicted fact is simply from the video. That would be the... That is. Okay. And that is specifically at time mark 1.38. You can see both firearms. You can see him. I've seen the picture. I know you've isolated that still and it's in the record. Right. And so... But with regard to... My judgment is that if he just puts his hand up, he won't get it. He would have had to do something extra to get it. But he doesn't reach toward it. You described it. It goes from the hand down to the torso. So to then say he's going down, but she can reasonably believe he's reaching up when he doesn't. Do you agree that he's rolling or at least angles to the right, which is the direction of where Officer Mason was? I believe that there is absolutely no connection or threat to Officer Mason or... That's not the question I asked. Do you agree that, at least in your view of the video, and I know you viewed it more times than I know you'd care to, that the direction of the going up is towards the right where Officer Mason would have been? No, I believe it was more of a crunch than a movement to the right. I think he was curling. And I don't believe that she was actually answering the final shot. I think she was talking about the second volley. And everybody's trying to merge what happens. I think she's using the justification for the second volley as justification for the final shot. He does go toward Officer Mason when he gets out of the car. There is a second volley of shots. I think she's describing that act and using it as justification for the final shot when it is not. He clearly is in a curl movement. And what I would say to the Court in terms of how the Court would want to frame it, that if a time limit is somehow put on it, there are too many fact patterns that that would eliminate. I think to the extent that the Court is struggling with it, that by itself means it's something for the jury to struggle with. Every issue that they are able to raise is in Hunter and or Robinson. Everything that they say in terms of shooting at the officers, pointing a gun, volleys of shots, falls down, all of it. Except for maybe the lurch slash twitch, right? Except for that. But again, it gets into the details where I don't think that that's necessarily relevant on the legal analysis. And if I may, my time is up. Yeah, sure. Yeah, finish up. With regard to clearly established, counsel mentioned the difference between this case factually and the Hunter case. But the difference factually between the Robinson case and the Hunter case are greater than the differences between this case and the Hunter case. And the Court relied on Hunter extensively. And so the smaller differences between this case and Hunter pale in comparison to those. So to the extent that Robinson relied so heavily on Hunter, I don't think clearly established is even an issue anymore, given how clear Robinson is on that issue. Okay, very well. Thank you both. Good work. The case is submitted and we'll move to the